The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. You can be seated. Okay, gentlemen, welcome back. Mr. Hurt, whenever you're ready. May it please the Court. The District Court erred in dismissing the complaint based on the public disclosure bar. Remanding in 2013, the Court reaffirmed the longstanding test set forth in Siller for when the pre-2010 public disclosure bar is triggered. The bar is triggered only when the knowledge of the facts underlying the action were actually derived from an applicable public disclosure. Here, the public disclosure are the public disclosures of the complaints and other filings in the FCA action filed by Mark Radcliffe. The District Court found that neither the relators nor their counsel had gained any relevant knowledge of the fraud as alleged in the allegations in their complaint from any of the public disclosures of the filings in the Mark Radcliffe action. Accordingly, applying this Court's test to the District Court's findings, the public disclosure bar was not triggered. Thus, the District Court erred as a matter of law in dismissing the action. Didn't Siller, didn't we forecast this very factual scenario in a footnote where we suggested that if an attorney, the same attorney, was involved in both the predecessor action and the new one and simply gleaned the same information as a result, that that would not be consistent with Siller and a different result might obtain? The information, the relator had the gist of the fraud. What the counsel did, her counsel, was simply have the same source, which was Mark Radcliffe, non-public information, and he used those details from the information he got through non-public sources in filling in some of the details of the complaint. The District Court's clear that Angela Radcliffe knew the gist of the fraud and it was only some details, exemplars of the fraud, that were derived indirectly from the same source, Mark Radcliffe, through her counsel. But the only reason that she knew was because it had been passed on to her. This just seems to me the very kind of parasitic action that the FCA and our cases, I hope, are not designed to encourage. It's very clear, the Court's been very clear that parasitic action is where the knowledge is gained from a public disclosure. There's simply no prohibition for a person learning second-hand from an eyewitness, either directly or indirectly, the information. It's if the information is derived from a public disclosure that the bar applies. And the Court's been very clear, and the test is very clear, and the text is very clear. It's a prohibition. It's not a requirement that a relator have any first-hand knowledge of the information. Well, let's say, for example, you have a relator who, with counsel, prepares a draft of a complaint and changes a few words before filing the final version. And then you have a subsequent relator who gets his hands on that draft complaint and never sees the final version of the complaint that was filed and ultimately dismissed for some unrelated reason. Are you saying that that second relator could bring his own key time action based solely on reading the draft complaint? Because under your reading of the statute, that would seem to be the result, and that can't be right. There's no difference between an eyewitness telling a friend, a co-worker, that fraud has happened and the co-worker can then bring, under the jurisprudence of this Court, can definitely bring the action. I see no difference between that and the relator writing up some of the fraud, whether it's used in a complaint or not, and the other person seeing that and then getting the information that way. There's a very narrow group of people that will get the information that way versus a public disclosure through TV, newspaper, et cetera. And there's really no public policy reason to change the rule to try to cut out those people or disqualify them from being relators. Well, let me take you back to, I think, the thrust of Judge Diaz's initial question, which goes to a footnote, footnote 8 in the Seiler decision. And the Court said in the beginning of the footnote that it was rejecting the Second Circuit's test, which is basically the post-March 2010 statutory provision now. Then it goes on to say, in that particular case, that the key plaintiff was an attorney who only learned of the pertinent fraud allegations through his representation of a client whose employer was being investigated for suspected fraudulent actions with the government. And this is the key part. However, under our reading of the statute, which we believe is more faithful to the enacted language, the same result might well obtain. It would appear from that footnote that the Court was envisioning pretty much your case. First of all, it says it might. It's not a holding of the Court. But in this case, that is not what happened. I did not bring the second suit based on Mrs. Radcliffe is the one. She knew about the gist of the fraud. I think the Court findings are— What's the difference between the attorney bringing it in the Court's example on that footnote and the attorney drafting it in this case and finding a name to fill in the blank? Well, that's not what happened. The facts, the District Court did not find those facts. The District Court found that Mrs. Radcliffe learned about the gist of the fraud even before Mr. Radcliffe filed his case. So she knew about the gist of the fraud. We drafted it. The attorneys drafted it and filled in some of the details based on nonpublic information that they had learned earlier. What detail is in this current version of the complaint that's different from the previous five or six versions other than Mrs. Radcliffe's name? Well, there's certain facts that the co-relator also included in that. But again, if you look at the test, this simply does not— To actually— The Siler test were based upon. You have to change the Siler test, and Purdue concedes that. They concede that. They say basically what they're asking the Court to do is to expand public disclosures in a civil hearing to include the attorney-client communications that occurred prior to the hearing. And they're saying the preceding communications by the relator that were necessary to affect that public disclosure. And that simply does violence to the text of the statute. It's not public, and it occurred before the civil hearing. So you really do have to change. If you take—that was simply a footnote in there that was not explored by the Court fully to see the full ramifications of it. It wasn't necessary in Siler. And so really, when you really look at the ramifications, applying it in this situation, you have to reject the Siler test and expand it, change it. And there's simply no public policy reason to do it here. You have a relator. There's maybe a doctrine where an attorney goes out and finds a new relator off the street. That's not the case here. This is a case of a wife of the original relator who knew the gist of the fraud before he even filed the complaint. There's no question about that. Let's say that we agree with you on the Siler test. You get past that part. How do you prevail under the fraud argument? The fraud argument, the 9B part. Oh, the 9B. First of all, this Court in Wilson said, once you conclude that you have no subject matter jurisdiction, stop. Put down your pen. You're done. And what happened here is we agreed with you, then we'd have to agree that there was subject matter jurisdiction. So now we're ready to move on. Okay. This complaint fully complied with Rule 9B. We have exemplars of a specific doctor issuing specific prescriptions for OxyContin after having received specific misrepresentations that the OxyContin had one-third more potency than it actually did. What you got besides the one doctor? That's the exemplar that we need. We have dozens of prescriptions that were issued by that, so dozens of individual false claims that were issued as a result, submitted as a result of this interaction with the doctor. So my reading of Nathan is that you need a false claim. We have dozens of false claims that we have set forth. Your case is solely about scripts written by this one physician. It's not about the one physician. The one physician is the exemplar. This was a nationwide, we allege this, a nationwide scheme to make this marketing misrepresentation. What gets you past the one physician? Pardon? What gets you past the one physician? What takes you past one physician that you've alleged facts about to the tens of thousands of others in the country? Because we allege that the misrepresentations that were made to that doctor were derived from a national training center where they were educating all of the reps to make this one specific misrepresentation. And so we said the eyewitness, Mark Radcliffe, had been to that and had been educated in that in a nationwide seminar by Purdue. So we allege this plausible that this misrepresentation, because they were educating all of these people, were being made throughout the country. So you say it's plausible, yet you've only got one allegation with one meeting with one doctor. No, we allege that these misrepresentations were made throughout the nation. The eyewitness made it throughout his district to all of the doctors. We list the doctors. A lot of doctors that were specifically marketed to in the complaint. You don't allege that they wrote a script. We allege that scripts were written in response to that. We can allege more than that, but our reading of Nathan is that if you allege a single false claim and the specifics of it, that meets the test. We think that we've done a sample, representative sample, because this was a nationwide, we allege it's a nationwide marketing scheme. And we set forth specific facts why that is plausible. So your view is in the KETAM action that by virtue of making an allegation with respect to the one physician, you would, if you were allowed to go past, you're entitled to basically go depose any physician in Alaska that you want. I think if you also make the other allegations about that it's a nationwide scheme and provide specifics to back that up, which we did, I think that it does provide the adequate allegations for a nationwide scheme. Thank you. Mr. Holchuk, did I say that right? Yes, sir. Or get it close enough? Very close. Okay. I don't know if I could have said it better. May it please the Court. The district court correctly concluded that relators did not carry their burden to establish subject matter jurisdiction under the pre-2010 version of the public disclosure bar. That ruling flowed from several factual findings that the court made after ordering discovery and conducting an evidentiary hearing. The court found first that relators knew nothing about most of the allegations in their own complaint. The relevant knowledge, the court found, came instead from relators' counsel, whose knowledge the relators agree should be imputed to them. And counsel, in turn, the court found, acquired the relevant knowledge from Mark Radcliffe in the course of drafting and filing the Key Tam 1 complaint. On these facts, the court concluded that the public disclosure bar was triggered, and that conclusion was correct when an attorney who has had an FCA complaint dismissed with prejudice just goes out and finds new clients who have little or no knowledge about the alleged fraud so that he can file, really refile, virtually the same complaint and thereby circumvent the dismissal. You have a quintessential example of what it is that Congress intended to foreclose in the public disclosure bar. Well, I guess this case is a little bit different because the second relator has a relationship with the first that suggests that she may have obtained the knowledge independently of the complaint. That seems to be the argument here and that that's enough to avoid disclosure. That is not enough under this Court's precedent, Your Honor. The district court found that Angela Radcliffe knew some of the details, the gist essentially, of the allegations in the complaint, and Stephen May brought some additional knowledge of his own from his time at Purdue, but that they knew nothing about most of the allegations. And the reason I say it's inadequate under this Court's precedent, Your Honor, and it's V.U. Rue, which was cited in turn in Radcliffe II, this Court's last decision in this case. If an FCA complaint is based even in part on a prior public disclosure, it is barred. Put it another way, it is the relator's burden to show that their knowledge or the allegations were based entirely on, based on entirely, to use the phrase from Seiler, private information that is not based at all on a public disclosure. So how do we reconcile Seiler with this case? This case is entirely consistent with Seiler, and counsel said at one point that we have conceded you have to change the Seiler test. We make no such concession. We don't agree that's the case. Seiler was about the interpretation of based on. This case is about the interpretation of the term public disclosure, and we explain in our brief how our proposed interpretation of public disclosure as encompassing the process, we cited dictionary definitions that give that as a definition of disclosure, process that lead our definition of disclosure that encompasses the process, how our definition does not in any way eviscerate or is in any way inconsistent with this Court's decision in Seiler. For example, and I think it goes directly to what this Court did in Radcliffe II, this Court sent it back so that the district court could make findings on whether the allegations in this complaint were based on the prior disclosure, the public disclosure, the QI-TAM I complaint. If the district court had found that all of the allegations in the complaint were based on, for example, conversations that Angela Radcliffe had with Mark Radcliffe over the dinner table or in some other context unrelated to the QI-TAM I disclosure, then the allegations under Seiler, the complaint under Seiler, would not be based on a prior disclosure, even though under the substantially similar test that prevailed in other circuits, it would be. So our reading of public disclosure absolutely preserves this Court's decision in Seiler, and as you alluded to, several of you alluded to, Judges Agee and Diaz, this Court previewed, admittedly in dicta, but in footnote 8 of Seiler, that this very circumstance would, in fact, be precluded by the public disclosure bar. Now, of course, relators disagree with that. They say that what constitutes a parasitic QI-TAM action is where the knowledge has come from a public disclosure, and they say that's the case law. I'm not sure what case law they're referring to. What Seiler itself said, and we quote it on page 17 of our brief, is that in the public disclosure bar, quote, Congress sought to prevent parasitic QI-TAM actions in which relators, so now it's going on to explain what's a parasitic QI-TAM action, in which relators, rather than bringing to light independently discovered information of fraud, simply feed off of previous disclosures of government fraud. That is this case. Angela Radcliffe and Mark Radcliffe, excuse me, neither relators nor their counsel have any independently discovered information of fraud. They are, quote, unquote, feeding off of Mark Radcliffe's disclosures. How do we know that that's the case and not the dinner, evening dinner conversation that you alluded to that might avoid the public disclosure bar? The district court expressly found that the relators knew nothing about most of the allegations in their complaints. So that's a factual finding that I don't believe relators have challenged on appeal and certainly could not be challenged as clearly erroneous in light of the record. The district court found yes, Angela Radcliffe knew a little, presumably from dinner conversations or the equivalent. Stephen May knew a little bit, again, presumably from his work at Purdue. But the majority of the allegations, relators had no knowledge of. So the district court's factual finding, I guess, is the short answer to your question, Your Honor. What about the factual finding that the district court made that the relators' counsel did not derive any of the information used in the current version of the complaint with these relators from the initial Radcliffe complaint? It seems an odd finding, but that's their factual finding, and I don't think you challenged that. We have not challenged that factual finding. The district court found that the information came, counsel's knowledge came from the process of drafting and filing the KTAM 1 complaint rather than from reading the as-filed KTAM 1 complaint. We have not challenged that, and that is why the legal question in this case is the scope of the statutory term, public disclosure. And, again, we have cited But what would be public about the process, the attorney-client process there? There's nothing public about that. Indeed, but we submit, Your Honor, that that should not be looked at in isolation. Again, we view public disclosure as properly read to mean the entire process that culminated in what everyone agrees here is a public disclosure, the filing of the KTAM 1 complaint. So, Judge Agee, if those attorney-client conversations had happened and they had not culminated in the filing of a complaint, surely there would then be no public disclosure. You would not have the same problem that you have here. But because you have the allegations having been disclosed in, again, what everyone agrees is a public disclosure, the filing of the KTAM 1 complaint, and we're talking about communications that were made by the original source, Mark Radcliffe, of information that was ultimately in the complaint, that is, was ultimately disclosed, and these communications having been made specifically in order to affect that public disclosure, we submit should be part of the public disclosure. And I said a moment ago that under Siler we regard this as a parasitic KTAM action. The United States, of course, agrees. The United States, whose interests the relators repeatedly invoke, and the United States that has repeatedly declined to intervene in this alleged fraud, the United States told the court in the last appeal, in its brief in the last appeal, and we quote it on page 20 of our own brief, relator's case is, quote, a parasitic follow-on lawsuit that Congress intended to prohibit when it enacted the public disclosure bar. Well, the government was quite correct in that regard. Now, I just want to address one hypothetical that relator's counsel made in the opening argument, which was to say if a friend tells a co-worker about a fraud, the co-workers free to go out and file that, the public disclosure bar would not be implicated. Well, that's much closer to the hypothetical I had a minute ago where the attorney-client communications happen, but there is ultimately no public disclosure. In the hypothetical relator's counsel posited, similarly, the friend has not first filed his or her own public FCA complaint or published a newspaper article or any of the other sources enumerated in the public disclosure bar before going out and filing such that the co-workers' complaint, I should say, would be barred by the public disclosure bar. Now, Your Honors. Isn't that what happened in Siler? There was a filing and then a subsequent complaint, but the court found that because the second relator uncovered the information independently that that was enough. Correct. And if the relators here, this goes back to the dinner conversations hypothetical, if the relators here had acquired their knowledge of the fraud completely independently of the public disclosure, which under Siler, not under other courts' interpretation of base bond, but under Siler, could include the dinner conversations because the allegations would still be substantially similar, but in that event the information would not have been learned from the public disclosure, that is, from reading the complaint or the communications through counsel, as we've argued, then you are outside the scope of the public disclosure bar. So it goes back to my earlier point, Your Honor, that our reading is in fact entirely consistent with Siler's reading of based upon, and again, save for footnote 8, which we submit cuts in our favor, this court did not reach the scope of the statutory term public disclosure. The reason, among the reasons that the term should be interpreted as we suggest, is the results that relators' contrary interpretation would lead to. This is one of them. We submit that's an indefensible result for the reasons some of the court discussed with counsel in the opening argument. The district court noted another one in its opinion, saying that a copy editor at a newspaper should not, in the course of doing his or her job, copy editing an article that was later to be published disclosing fraud, copy editors should not be able to take that knowledge, then go file his or her own FCA lawsuit involving the same allegations of fraud, and claim, well, I didn't read the as-published newspaper article, but under their reading that is the result that would obtain. Your Honors, if the courts have no further questions on public disclosure, I will turn to the 9B argument. I want to address the points that counsel did speak to in 9B, but I would note at the outset that there was no discussion in the topside argument of either Sienta or materiality, and at least as to Sienta, perhaps that's not surprising. There was no discussion of it in the reply brief, very little in the opening brief, and all that, Your Honors, I submit is because the complaint quite clearly does not adequately allege Sienta. This court stated in Wilson, quoted on page 45 of our brief, that FCA plaintiffs must allege facts, specific facts, from which a court can draw an inference of Sienta. Once you take out what we think are quite clearly just the conclusory allegations at various points in the complaint, that Perdue knew this and Perdue knew that, there is exactly one paragraph in the complaint that speaks to the issue of Sienta. It's paragraph 13. And what relators say in paragraph 13 of the amended complaint is that the facts, the fact they allege to support the inference of Sienta is that the Perdue representatives, who allegedly made these allegations to the doctors, pointed the doctors, that is, and again, this is all to support that Perdue knew the equi-analgesic ratio between oxycontin and MS-contin was, in fact, materially lower than 2 to 1, closer to 1.5 to 1. The fact they point to, the alleged fact they include in the complaint, was that the Perdue representatives pointed the doctors to an FDA-approved package insert in, approved for oxycontin. That insert stated that the ratio was 2 to 1, precisely the ratio that the Perdue representatives allegedly told the doctors. Okay, so that fact I submit by itself clearly could not support, and it doesn't even support the inference that the ratio was materially lower than 2 to 1, let alone that Perdue knew it. So the relators go on to make one further factual allegation, which is that the ratio in the FDA-approved insert, we're still in paragraph 13, was derived from a study of a single dose of the respective drugs. That's it. Okay, there is nothing that allows a court to make the leap from there, again, even to the fact that the ratio was something other than 2 to 1 in the chronic pain context, let alone that Perdue knew it was. And, again, this insert was the FDA had approved this drug only for chronic pain. So when it said the ratio is 2 to 1, it was instructing patients on how to transition from another drug. And this is, for example, page JA93 of the joint appendix is the relevant page of one of the FDA inserts. The FDA was saying that in regard to the specific context in which this drug had been approved. So, again, there's simply no basis to conclude, again, even that the insert, that the ratio was less than 2 to 1. In fact, we submit that the court is not required to credit the allegation that it was materially less than 2 to 1 in light of the package insert. We attach the package inserts to our motion to dismiss, and it's integral to the complaint. So under this court's precedent, it's something that can be considered on a 12B6. And that allegation of the ratio being materially less than 2 to 1 is refuted by the package insert. But even if it weren't, there's certainly no basis to conclude that the FDA, excuse me, that Purdue having that package insert, seeing that package insert, would have reason to know, did know, that the ratio was, in fact, materially lower in a different context. And the failure to allege CENTER is simply fatal to the entire complaint. Let me turn to materiality, if I may. I think there's a simple but relatively fatal flaw with the manner in which the relators are arguing materiality. They are suggesting that the materiality test is whether the government, in essence, would have cared if it had known it had been lied to. That is not, Your Honors, the materiality test. In fact, I submit that would all but read materiality out of the statute, because it's difficult to envision a circumstance in which the government would not care if it had been lied to. The materiality test is whether the government would have been less likely to pay had it been told a true set of facts rather than the false set of facts. In other words, a hypothetical, well, from our perspective, we're in a hypothetical world because this never happened, but we have to take the allegations as true. So, in other words, materiality is in a hypothetical world in which the government had never been lied to. So, for example, in the triple canopy case that the relators rely on, the allegedly true fact, excuse me, the allegedly false fact was that contractor security guards at an overseas military base had certain training that they could, in this Court's words, shoot straight. And the Court considered whether the government would have paid on the contract, the subcontract, yes, the contract, had it instead been told that the guards could not shoot straight. The Court quite sensibly concluded that the answer was no. Even more clearly, I submit, in the Harrison v. Westinghouse case that the relators also cite, the issue was a certification by a contractor to the government that it had no OCI, organizational conflicts of interest. And the Court explained that that statement was material not because, as under relator's test, the government would have cared if it had known it had been lied to. Rather, what the Court said was that it was material because, quote, if Westinghouse had not included the no OCI certification, in other words, if it had told the truth, DOE would not have approved the subcontract. That's 352 F3rd at 916. So that is the materiality test. And as a result, the question is whether the government likely would have refused to pay for OxyContin prescriptions if it had been told the allegedly true fact, that is a 1.5 to 1 equi-analgesic ratio, rather than the allegedly false fact, a 2 to 1 ratio. There is simply nothing anywhere in the complaint to suggest that the answer to that question is yes. There are no criteria pointed to in the complaint by which the government decided whether or not to pay these sorts of claims. And we submit, particularly in light of the evidence we submitted, again, in moving to dismiss that it's entirely implausible because what we submitted is evidence showing that government agencies make these sorts of decisions in advance. They create these formulary lists after consulting with physicians, insurance companies, drug companies, and other relevant actors. They lay out the criteria in advance for when they will pay on a certain prescription and when they will not. And if those criteria are met, payment is automatic. So there is, in other words, no cost sensitivity. And the government would not have cared had it been told the allegedly true fact, 1.5 to 1, rather than the allegedly false fact, 2 to 1. Your Honors, I want to speak very briefly to the points that were addressed on 9B in the opening argument. Judge Agee, you are entirely correct. There is nothing, there is not one prescription claim, submission of a prescription claim alleged in the complaint other than those as to Dr. Jarvis. And all of those, by the way, are completely outside, at this point, the statute of limitations. In light of the Carter Supreme Court case, it's clear that the relators can no longer rely on the Wartime Suspension of Limitations Act. So even if this Court were to conclude that the allegations as to Dr. Jarvis were correct, and we submit that they should not for the scienter materiality and other reasons I can get into, there is no basis to allow them to proceed on any further claims. There's no basis to conclude that Dr. Jarvis by himself is a representative sample, as other courts have required in order to allow this sort of scheme to go forward. And, of course, once the Court decides that Dr. Jarvis' own, the allegations regarding Dr. Jarvis are insufficient, then you really are right back into the Nathan v. Decatur case, where the Court said it's simply insufficient solely to allege a scheme and then ask the Court to infer that false claims were submitted as a result, unless you're in the situation where the scheme itself necessarily would have led to the submission of false claims. We're certainly not in that case here, Your Honor, because a doctor would have to first credit what the sales representative told him, would have to then make the decision to file the, to prescribe the drug based on those representations, and then would have to submit a claim to a government agency for reimbursement. None of the, there are too many breaks in the causal chain to conclude that this is a necessarily led to circumstance. Your Honor, unless. I want to make sure I understand your argument with respect to materiality and cost. Are you saying that as a general proposition, the government would never have been concerned about cost in this context? Chief Judge Ratcher, my time is about to expire. May I answer? No, Your Honor, that is not our contention. Our contention is that the government makes these decisions in advance, undoubtedly taking cost into effect. But once those decisions have been made, there is no price sensitivity. So if I can give a more concrete example. With OxyContin, several, the West Virginia Board, for example, we put it in at JA-140. The VA that they also, the regulators also refer to, we put it in at JA-128. Both indicated that there were very specific circumstances in which OxyContin could be prescribed. For example, if patients had shown an inability to tolerate other chronic pain relief drugs. But if those criteria are met, if a doctor certifies or exercises his or her best judgment to indicate that those criteria have been met, then indeed, yes, Your Honor, the government has made the decision in those circumstances where, in my hypothetical, a patient will not tolerate other drugs. The government is not price sensitive such that the allegedly true facts rather than the allegedly false facts would have likely changed its payment decision. Thank you, Your Honors. Mr. Hearn. I'd like to address the materiality issue first. What we plead in effect is that the key measurement of how much OxyContin was sold was the units of pain relief. And that their misrepresentations, in effect, are representing that they're providing one-third more of the quantity than they actually provided. We think that that's clear that the government would be concerned. about that and would want to adjust the price that they're paying for it, given these blatant misrepresentations, to doctors to hype it to get the doctors to prescribe. Going back... What factual allegations related to C-ENTR do you say are in the complaint? That they knew that this was false, that they were relying on telling their salesmen to point to this acute pain study when they were only authorized to market it for chronic pain. And, again, we can beef up that if we're... I'm sorry. Well, you're on, I think, complaint number seven now for this basic same set of facts. What is there in any of these that shows that Purdue knew that there was not a two-to-one ratio? Because the study was an acute pain study, and we say that that was not relevant to the effective quantity that they were providing. And this was only the first amended complaint. The court has never, in either case, told us that this allegation, either in the old case or the new case, was inadequate. We would say that we would have a right to amend at least once in response to a shortcoming, if that is a shortcoming. We've never had a chance to do that. Well, hadn't you already amended once after the last appeal? We amended one time, but not because the district court told us that our complaint was inadequate. We amended through agreement with defendants to amend. We were never told that the complaint was inadequate in any aspect prior to this decision by the district court. And the district court didn't say that it was futile for us to amend on this issue. They only said that because we could not plead every single, all the hundreds of thousands of individual claims, that that was why the court ruled that it was futile. The court did not rule that it was futile for us with respect to this issue. So I think that, at a minimum, we should have a chance to amend if that is a shortcoming that the court determines is a shortcoming. Going back to the public disclosure bar, I think Purdue made it clear that they are arguing for the district court's basically confusing, conflating the underlying information with the public disclosure of that information. And the district court couldn't have been clearer when it said that the bar was triggered because the information contained in the instant complaint was derived from information that gave rise to the QTAM 1 complaint. That's the basis for the court's ruling, and that's clearly completely contrary to Seiler. Under their rationale or test, you get these absurd results. For instance, if the counsel derived one fact indirectly through an eyewitness as opposed through the client, then under their argument, the bar precludes the complaint. There's nowhere in Seiler that prohibits getting secondhand information either directly or indirectly. The bar is deriving knowledge from the public disclosure, not the underlying information. And Seiler was absolutely clear, and this court was absolutely clear on that. And here the district court's findings made it absolutely clear that there was no knowledge that went into the complaint that was derived from a public disclosure. So the court really needs to change the test, if it goes Purdue's way, to what they're saying is that any of these conversations that preceded the public disclosure, if anything's derived from that, then that, the bar applies. And again, it's a chain. From the fraud up until the time the first complaint is filed, there are all these conversations. So this would preclude almost any person that's not an eyewitness that learns about it through those chains of conversations, deriving that knowledge, they will be precluded. This is simply not what Seiler ruled on. This does violence to the text of the public disclosure bar. What we urge the court is simply to stick with Seiler and the precise test of Seiler. There's not enough False Claims Act cases that are being brought, less than 1,000, for hundreds of thousands of dollars, billions of dollars of fraud. And there's no reason for this court to go out of its way and tinker with the test in Seiler and expand it in a way that really is not justified by the text of the public disclosure bar. Again, the materiality, the test was set forth in Triple Canopy. It's not the test that Purdue set forth. And I think that was common sense in that case. It's common sense in this case. If a person is exaggerating the effective quantity that they're providing to the doctor, to Medicaid, that's going to be something that is material to the decision maker to pay. Thank you. Thank you. I will come down and greet counsel and then go on to the next case.
judges: William B. Traxler, Jr., G. Steven Agee, Albert Diaz